

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

ENTERED
02/03/2010

| | | |
|---|---|---|
| IN RE: | § | Case No. 09-32428 |
| SPRINGTOWNE FAMILY | § | Chapter 11 |
| INVESTMENTS, LLC; dba | § | |
| SPRINGTOWNE APARTMENTS, | § | |
| Debtor(s). | § | Judge Isgur |

### MEMORANDUM OPINION OVERRULING
### DEBTOR'S OBJECTION TO CLAIM

For the reasons set forth below, the Court overrules the Debtor's objection (docket no. 58) to the proof of claim (claim registry no. 7) filed by Dixie Carpet Installations, Inc ("Dixie"). Accordingly, Dixie's claim is allowed and fully secured in the amount of $42,406.50.[1]

### Background

The Court conducted an evidentiary hearing on the Debtor's objection on December 7, 2009. The Court made the following findings of fact on the record:

1. The Debtor's property supervisor contacted Dixie to "make ready"[2] a group of apartments owned by the Debtor.

2. Though the parties did not have a written agreement, they had an oral agreement that Dixie would install carpeting to a group of apartments.

3. The group of vacant apartments was not identified by apartment or building number. However, the Debtor told Dixie that it needed carpet installed in a "quantity" of units, not just in one unit.

---

[1] The total amount owed by the Debtor to Dixie for the 33 carpet installations is $27,751.45. The property to which Dixie's lien rights attached is valued at over $7,000,000.00. Therefore, pursuant to 11 U.S.C. § 506(b), Dixie is over-secured and entitled to post-petition interest. Furthermore, because the Debtor's confirmed plan (docket no. 41) does not explicitly preclude the accrual of post-confirmation interest, the Court also awards post-confirmation interest. Based on an uncontested interest rate of 5.00%, Dixie has accumulated $2,528.04 in interest ($27,751.45 x 0.05 x (665/365)). With the addition of $12,127.01 in legal fees, which the Court preliminarily found as reasonable and necessary if the entirety of Dixie's claim was secured, the total amount of Dixie's secured claim is $42,406.50 ($27,751.45 + $2,528.04 + $12.127.01).

[2] A "make ready" project converts a unit from a non-livable to a livable or leasable condition, and includes such services as carpet installations.

4. Based on the expectation that it would "make ready" a quantity of units, Dixie gave pricing in bulk. Dixie provided the Debtor a price sheet with quotes based on: (1) a unit's particular floor plan; (2) whether the unit was vacant or occupied; and (3) whether carpet installation would be with padding.

5. Dixie installed carpeting in a total of 33 apartments during the months of September through December, 2007. Each installation occurred at the Debtor's request and only after the Debtor identified the specific unit.

6. Dixie issued an invoice after every installation it completed for a total of 33 individual invoices.

7. The last installation Dixie performed was on or about December 28, 2007.

8. Dixie filed an affidavit for statutory materialman's lien rights on account of the total labor and materials it provided to the Debtor. The affidavit was filed with the County Clerk of Harris County, Texas on April 9, 2008.

The parties do not dispute that the April 9, 2008 affidavit was timely filed with respect to the December, 2007 installations. Under Texas property law, an affidavit must be filed "not later than the 15th day of the fourth calendar month after the day on which the indebtedness accrues" to perfect a materialman's lien. TEX. PROP. CODE § 53.052. Section 53.053 defines when indebtedness accrues. TEX. PROP. CODE § 53.053. With respect to an original contractor, who is defined as a person who contracts with an owner either directly or through the owner's agent, indebtedness accrues "on the last day of the month in which the original contract has been completed, finally settled, or abandoned." TEX. PROP. CODE §§ 53.001, 53.053(b)(2). Accordingly, April 15, 2008 was the last day on which Dixie could timely file an affidavit for all of its December installations.

The dispute is over whether the April 9, 2008 affidavit was timely filed with respect to the September, October, and November, 2007 installations. This issue turns on whether the 33 installations were performed under one continuing contract or under several distinct and separate contracts.

If the installations were performed under one continuing contract, the contract was not completed by Dixie until December, 2007. Under this interpretation, the April 9, 2008 affidavit would be timely filed with respect to all 33 installations. However, if the 33 installations were performed under separate contracts, affidavits were required by the 15th of January, February and March, 2008 for the September, October, and November, 2007 installations, respectively. The latter interpretation would leave Dixie's claim secured only with respect to its December, 2007 installations, and unsecured with respect to its remaining installations.

## Jurisdiction

This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1334. Venue is proper in this District pursuant to 28 U.S.C. § 1408.

## Analysis

In considering whether the parties had one continuing contract or several distinct and separate contracts, the Court is guided by the well established principle in Texas law that "the mechanics' [and materialmen's] lien statutes are to be liberally construed in favor of protecting the interests of laborers and materialmen." *Blanco, Inc. v. Porras*, 897 F.2d 788, 790 (citing *Republicbank Dallas, N.A. v. Interkal, Inc.*, 691 S.W.2d 605, 607 (Tex. 1985); *First Nat'l Bank v. Whirlpool Corp.*, 517 S.W.2d 262, 269 (Tex. 1974); *Hayek v. W. Steel Co.*, 478 S.W.2d 786, 795 (Tex. 1972)).

> "One reason for the lien statutes and the liberal rule of construction is that labor and materials lose all further value to the laborer and materialman once they are furnished and put into the house or building, but they usually enhance the value of the property to the benefit of the owner and those who take under him." Moreover, Texas is not a jurisdiction which applies a "strict compliance" rule before a lien exists, but rather follows a 'substantial compliance' rule.

*Marathon Metallic Bldg. Co. v. Tex. Nat'l Bank*, 534 S.W.2d 743, 747 (Tex. Civ. App.—Waco 1976, no writ) (citation omitted).

1.  **The Parties' Agreement**

The threshold issue is to determine what the parties' contract was. *See Page v. Structural Wood Components, Inc.*, 102 S.W.3d 720, 722 (Tex. 2003). To form a valid and binding contract, there must be: (1) offer; (2) acceptance in strict compliance with the terms of the offer; (3) a meeting of the minds; (4) each party's consent to the terms; and (5) execution and delivery of the contract with the intent that it be mutual and binding. *Roman v. Roman*, 193 S.W.3d 40, 50 (Tex. App.—Houston [1st Dist.], 2006, pet. denied) (op.). "Consideration is also a fundamental element of every valid contract." *Id.*

The evidence shows that the Debtor's property supervisor contacted Dixie to inquire about Dixie's services and prices. The property supervisor informed Dixie that it was interested in a "quantity" of installations. Based on this inquiry, Dixie offered pricing in bulk which took into account several factors, including a unit's particular floor plan, whether the unit was vacant or occupied, and whether carpet installation would be with padding.

Subsequently, the Debtor's property supervisor called Dixie to request each of the 33 installations, which Dixie completed. Both parties relied on their original negotiations to carry out each of the installations.

The Court finds that there was no agreement between the parties until the Debtor ordered the first carpet installation. Before that event, the Debtor only solicited quotes for bulk installations, and Dixie only offered to perform them at bulk pricing. Once the Debtor ordered the first carpet installation, the Debtor not only accepted Dixie's offer, but also partially performed its promise to order in bulk. Dixie relied on the Debtor's promise to order in bulk in performing the first installation as well as charging for it at the bulk rate.

2. **The Contract was a Continuing Contract**

   a. **The Parties' Principal Purpose**

   Though the parties' terms of agreement did not include a certain number of installations, they did require that the Debtor order in bulk and Dixie charge in bulk. That was the parties' agreement. Accordingly, at the minimum, the parties agreed to more than one carpet installation. Even if the Debtor could have stopped ordering after two or ten or any unspecified number of installations over one, this fact is not controlling. Rather, "[the parties'] principal purpose . . . is ascertainable [and] is given great weight." RESTATEMENT (SECOND) OF CONTRACTS § 202 (1981). It is clear that the parties' principal purpose, on which their minds met, was to contract for bulk installations at bulk pricing. Therefore, Dixie's offer to perform installations at bulk pricing was for the indivisible exchange of bulk orders by the Debtor. RESTATEMENT (SECOND) OF CONTRACTS § 31 (1981). The parties' indivisible exchange of bulk orders for bulk pricing produced one continuing contract, not 33 distinct and separate contracts.

   b. **The Parties' Conduct**

   The parties' conduct also indicates that the installations were part of an indivisible exchange. During the course of the parties' contractual relationship, the parties had an understanding that every requested installation was pursuant to the parties' original negotiation. The Debtor and Dixie did not engage in subsequent negotiations. Nor did they give successive offers or acceptances with respect to each order. Consequently, the only reasonable interpretation is that the 33 installations were performed pursuant to one original negotiation that produced one continuing contract. *See* RESTATEMENT (SECOND) OF CONTRACTS § 203(a) (1981) (stating that contracts should be construed in a way that gives reasonable, lawful and effective meaning to all the terms of the agreement). A different interpretation would ignore aspects of

the parties' course of conduct. For instance, an interpretation that found the 33 installations represented several and distinct contracts would render meaningless Dixie's promise to provide bulk pricing in exchange for the Debtor's promise to order bulk installations. It would also ignore the parties' behavior with respect to each of the 33 installations, which was that each order was conducted pursuant to the parties' previous negotiation.

Furthermore, the Court's conclusion comports with the logic in *Hughes*. In *Hughes*, a property owner bought materials to erect an apartment building. *Sw. Elec. Co. v. Hughes*, 139 Kan. 89, 92 (Kan. 1934). The seller gave prices based on an amount of material. *Id.* However, the parties did not have a definite agreement that the owner would buy any specified quantity. *Id.* The owner relied on the prices quoted to order the materials as he required them, which were delivered by the load. *Id.* The owner was charged for every load he ordered on a running account. *Id.* at 92-93. The Court held that each delivery did not represent a separate transaction. *Id.* at 93. Rather, "[t]he first, last and all intermediate deliveries were made pursuant to the original negotiation, and constituted parts of one continuing, connected transaction, carried on the books of the materialman in a continuous running account." *Id.*

Unlike in *Hughes,* Dixie did not have a running account for the Debtor to which it charged each installation. Instead, Dixie invoiced each installation separately. However, as in *Hughes*, Dixie's quoted prices were based on a "quantity" or bulk of installations, and not any specified amount. Moreover, the Debtor, akin to the owner in *Hughes*, relied on Dixie's quoted prices to order each of the 33 installations as it required them. The understanding on which the Debtor and Dixie conducted their business is the same as that in *Hughes.* Therefore, despite the existence of 33 separate invoices, the 33 installations were not separate transactions but rather connected. Each was performed and priced pursuant to the parties' original negotiation, and part

of one continuing contract.

### c. Public Policy

Because the Court finds that the parties' agreement constituted one continuing contract, the Court concludes that Dixie's affidavit was timely filed to secure its statutory lien rights for all its installations. The Court rests this conclusion on the aforementioned principle that Texas mechanics' and materialmen's lien statutes are to be liberally construed in favor of protecting the interests of laborers and materialmen.

### Conclusion

Dixie's claim is allowed and fully secured in the amount of $42,406.50. The Debtor's objection is overruled. The Court will issue a separate order.

SIGNED **February 3, 2010.**

Marvin Isgur
UNITED STATES BANKRUPTCY JUDGE